UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
          :
IN RE VEECO INSTRUMENTS INC.      :    No. 7:05-MD-01695-CM
SECURITIES LITIGATION         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
          :
THIS DOCUMENT RELATES TO:     :
ALL ACTIONS            :
          :
          :
          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
## MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
Phone: (212) 351-4000
Fax: (212) 351-4035

Attorneys for Defendants Veeco Instruments Inc.,
Edward H. Braun, John F. Rein, Jr. and John P. Kiernan

December 2, 2005

# TABLE OF CONTENTS

Page No.

PRELIMINARY STATEMENT..................................................................................1

STATEMENT OF FACTS ......................................................................................3

    I.    THE PARTIES ......................................................................................3

        A.    Lead Plaintiff ......................................................................3

        B.    Defendants ......................................................................3

    II.    VEECO'S ACQUISITION OF TURBODISC ......................................3

    III.    VEECO'S DISCOVERY OF POTENTIAL ACCOUNTING ERRORS AT THE TURBODISC DIVISION ......................................4

    IV.    VEECO'S RESTATEMENT OF ITS FINANCIAL RESULTS FOR THE FIRST THREE QUARTERS OF 2004 ......................................4

    V.    PLAINTIFF'S CONSOLIDATED AMENDED COMPLAINT ..............5

ARGUMENT...........................................................................................5

    I.    PLAINTIFF'S SECTION 10(B) CLAIM SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM AND FAILURE TO PLEAD FRAUD WITH PARTICULARITY ......................................5

        A.    Optimistic Statements About TurboDisc Are Not Actionable....................7

        B.    Allegedly Unwise Business Decisions Relating to the New TurboDisc Division Do Not Give Rise to a Securities Fraud Claim.......... 10

        C.    Plaintiff's Fraud By Hindsight Allegations Relating to the Restatement Are Patently Insufficient......................................................12

            1.    Plaintiff Cannot Demonstrate That Defendants Had Any Motive to Defraud.........................................................................13

                a.    The Absence of Any Stock Sales Precludes Any Credible Inference of Motive ............................................13

                b.    Plaintiff's Attempt to Invent a Motive Is Unavailing.........14

            2.    Plaintiff Has Failed to Identify Specific Facts Establishing Conscious Misbehavior or Recklessness........................................15

i

|     |      |                                                                            |      |
| --- | ---- | -------------------------------------------------------------------------- | ---- |
|     | a.   | Overstatement of Inventory                                                 | 16   |
|     | b.   | The Revenue Recognition Issue Relating to the Sanan Contract               | 17   |
|     | c.   | Warranty Costs/Reserves                                                    | 19   |
|     | d.   | Recognition of Transitional Services Agreement Revenue                     | 22   |
| II. |      | PLAINTIFF'S SECTION 20(a) CLAIM SHOULD BE DISMISSED                        | 25   |
| CONCLUSION |  |                                                                            | 25   |

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Abrams v. Baker Hughes Inc.*, 292 F.3d 424 (5th Cir. 2002) ................................................................. 13

*Acito v. IMCERA Group, Inc.*, 47 F.3d 47 (2d Cir. 1995) ...................................................................... 10

*Castillo v. Dean Witter Discover & Co.*, No. 97 Civ. 1272 (RPP), 1998 WL 342050
(S.D.N.Y. June 25, 1998) .................................................................................................................. 6

*Chiarella v. United States,* 445 U.S. 222 (1980) ..................................................................................... 6

*Chill v. General Elec. Co.*, 101 F.3d 263 (2d. Cir. 1996) .................................................... 11, 12, 14, 15

*Ciresi v. Citicorp*, 782 F. Supp. 819, 821 (S.D.N.Y. 1991), *aff'd*, 956 F.2d 1161 (2d Cir. 1992) ......... 20

*Coates v. Heartland Wireless Commun., Inc.*, 55 F. Supp. 2d 628 (N.D. Tex. 1999) ........................... 24

*Dura Pharm., Inc. v. Broudo*, 125 S. Ct. 1627 (2005) ................................................................. 2, 9, 22

*Endovasc Ltd., Inc. v. J.P. Turner & Co., LLC*, 2004 WL 634171 (S.D.N.Y. Mar. 30, 2004) ............... 6

*Fadem v. Ford Motor Co.*, 352 F. Supp. 2d 501 (S.D.N.Y. 2005) ........................................... 12, 16, 17

*Faulkner v. Verizon Commun., Inc.*, 189 F. Supp. 2d 161 (S.D.N.Y. 2002) ............................................ 5

*Freedman v. Value Health, Inc.*, Nos. 3:95CV2038, 3:97CV2711, 2000 WL 630916
(D. Conn. Mar. 24, 2000) ................................................................................................................ 20

*Gavish v. Revlon, Inc.*, No. 00 Civ. 7291 (SHS), 2004 WL 2210269 (S.D.N.Y. Sept. 30, 2004) ......... 17

*In re Allied Capital Corp. Secs. Litig.*, No. 02 Civ. 3812 (GEL), 2003 WL 1964184
(S.D.N.Y. Apr. 25, 2003) ................................................................................................................ 25

*In re Am. Express Co. Shareholder Litig.*, 840 F. Supp. 260 (S.D.N.Y. 1993), *aff'd*, 39 F.3d 395
(2d Cir. 1994) ............................................................................................................................ 10, 20

*In re Bristol-Myers Squibb Secs. Litig.*, 312 F. Supp. 2d 549 (S.D.N.Y. 2004) ........................... 7, 12, 16

*In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410 (3rd Cir. 1997) ......................................... 21

*In re Carter-Wallace Inc. Secs. Litig.*, 150 F.3d 153 (2d Cir. 1998) .................................................... 12

*In re Citigroup Inc., Secs. Litig.*, 330 F. Supp. 2d 367 (S.D.N.Y. 2004) ............................... 6, 10, 15, 20

**Table of Authorities**
**(Continued)**

Page(s)

*In re Corning Secs. Litig.*, No. 01-CV-6580-CJS, 2004 WL 1056063 (W.D.N.Y. Apr. 9, 2004),
   *aff'd*, No. 04-2845-CV, 2005 WL 714352 (2d Cir. Mar. 30, 2005) .................................... 16

*In re Crystal Brands Secs. Litig.*, 862 F. Supp. 745 (D. Conn. 1994) .................................... 14

*In re Duane Reade Inc. Secs. Litig.*, No. 02 Civ. 6478 (NRB), 2003 WL 22801416
   (S.D.N.Y. Nov. 25, 2003), *aff'd*, No. 03-9352, 107 Fed. Appx. 250 (2d Cir. 2004) ...................... 8, 9

*In re Duke Energy Corp. Secs. Litig.*, 282 F. Supp. 2d 158 (S.D.N.Y. 2003), *aff'd*, 113 Fed.
   Appx. 427 (2d Cir. 2004) ........................................................................ 11, 22

*In re Federated Dep't Stores, Inc., Secs. Litig.*, No. 00 CV 6362 (RCC), 2004 WL 444559
   (S.D.N.Y. Mar. 11, 2004) ........................................................................ 11, 13

*In re Flag Telecom Holdings, Ltd. Secs. Litig.*, 308 F. Supp. 2d 249 (S.D.N.Y. 2004) .................. 18, 19

*In re Galileo Corp. Shareholders Litig.*, 127 F. Supp. 2d 251 (D. Mass. 2001) .................................... 21

*In re IPO Secs. Litig.*, No. MDL 1554 (SAS), 2005 WL 1162445 (S.D.N.Y. May 6, 2005)................. 23

*In re Keyspan Corp. Secs. Litig.*, 383 F. Supp. 2d 358 (E.D.N.Y. 2003)................................. 15

*In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371 (S.D.N.Y. 2001) ........................... 18, 24

*In re MSC Indus. Direct Co., Inc. Secs. Litig.*, 283 F. Supp. 2d 838 (E.D.N.Y. 2003) ........................ 19

*In re SCB Computer Tech., Inc. Secs. Litig.*, 149 F. Supp. 2d 334 (W.D. Tenn. 2001) ........................ 12

*In re Union Carbide Class Action Secs. Litig.*, 648 F. Supp. 1322 (S.D.N.Y. 1986) ........................ 11

*Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001).............................................................. passim

*Kane v. Madge Networks N.V.*, No. C-96-20652-RMW, 2000 WL 33208116 (N.D. Cal.
   May 26, 2000), *aff'd*, No. 00-16344, 32 Fed. Appx. 905 (9th Cir. 2002) ............................ 8

*Leemon v. Burns*, 175 F. Supp. 2d 551 (S.D.N.Y. 2001)......................................................... 6

*Lemmer v. Nu-Kote Holding, Inc.*, No. Civ. A. 398CV0161L, 2001 WL 1112577 (N.D. Tex.
   Sept. 6, 2001), *aff'd*, No. 02-11080, 2003 WL 21919902 (5th Cir. 2003) ......................... 16

*Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161 (2d Cir. 2005) .......................................... 9

*Lexar Media Inc. Secs. Litig.*, No. C-04-2013 SC, 2005 WL 1566534 (N.D. Cal. July 5, 2005)........... 17

*Podany v. Robertson Stephens, Inc.*, 318 F. Supp. 2d 146 (S.D.N.Y. 2004)............................... 9

**Table of Authorities**
**(Continued)**

Page(s)

*Polycast Tech. Corp. v. Uniroyal, Inc.*, No. 87 CIV. 3297 (JMW), 1988 WL 96586 (S.D.N.Y. Aug. 31, 1998) ................................................................................................................ 19

*Rand v. Starter Corp.*, No. 94 Civ. 5325, 1995 WL 322024 (S.D.N.Y. May 30, 1995)..................... 12

*Rapoport v. Asia Elecs. Holding Co.*, 88 F. Supp. 2d 179 (S.D.N.Y. 2000)......................................... 18

*Remec Inc. Secs. Litig.*, 388 F. Supp. 2d 1170 (S.D. Cal. 2005)............................................................ 17

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004) .............................................................................. 8, 9

*Sakhrani v. Brightpoint, Inc.*, No. IP99-0870-C-H/G, 2001 WL 395752 (S.D. Ind. Mar. 29, 2001) ..... 23

*San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801 (2d Cir. 1996).................................................................................................................... 7, 11

*Santa Fe Indus., Inc. v. Green*, 430 U.S. 462 (1977)............................................................................ 10

*Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124 (2d Cir. 1994)..................................................... 15, 24

**Table of Authorities**
**(Continued)**

Page(s)

**Statutes**

15 U.S.C. § 78u-4(b)(1) ............................................................................................... 6

15 U.S.C. § 78u-4(b)(4) ............................................................................................... 6

15 U.S.C. § 78u-5(c)(1) ............................................................................................... 9

15 U.S.C. §78u-4(b)(2) ............................................................................................ 6, 18

15 U.S.C. 78u-5(c) ...................................................................................................... 2

F.R.C.P. 9(b) ............................................................................................................... 1

Rules 12(b)(6) ............................................................................................................. 1

**Regulations**

Securities and Exchange Act of 1934, Section 10(b) ................................................. 5

Securities and Exchange Act of 1934, Section 20(a)................................................. 5

Defendants Veeco Instruments Inc. ("Veeco"), Edward H. Braun, John F. Rein, Jr. and John P. Kiernan respectfully submit this memorandum of law in support of their motion, pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure, for an order dismissing Plaintiff's Consolidated Amended Complaint (the "Amended Complaint") for failure to state a claim and failure to plead with particularity.[1]

## PRELIMINARY STATEMENT

The Amended Complaint, based on a restatement issued without any earmarks of wrongdoing, is replete with the usual pejoratives, but when one looks beyond the buzzwords, as one must, the Amended Complaint lacks the particularized allegations of underlying facts necessary to escape dismissal.  In late 2003, Veeco acquired a business unit called TurboDisc from Emcore Corporation.  In late 2004, while transitioning TurboDisc into its business, Veeco discovered potential accounting errors in TurboDisc's financial records.  After a thorough investigation, Veeco announced a restatement in February 2005 to correct those errors.  There is no suggestion that this restatement was prompted by a governmental investigation, by a top official's resignation, by pressure from a whistleblower, or by rumors in the market.  No particularized facts are alleged that show that Defendants had any fraudulent intent when they made the challenged statements.  Having acted responsibly with swift, voluntary actions, Veeco was slapped with this meritless lawsuit alleging that it had engaged in *fraud* to hide the very accounting errors that it had just discovered, corrected and disclosed.

Plaintiff essentially offers three theories of fraud concerning Veeco's TurboDisc business unit, all of which are negated by the holes in Plaintiff's pleading.  First, Plaintiff alleges that Veeco made misleading *forward-looking* statements concerning its *expectation* that the TurboDisc acquisition would

---

[1]  Defendant R. Michael Weiss has not been served with a copy of the Amended Complaint.  The arguments herein, however, apply equally to him.

be accretive and would result in synergies. *See* Compl. ¶¶ 32-33, 78-83, 101, 104, 110. This line of attack fails because Veeco's statements concerning its business prospects were accompanied by explicit cautionary language (*see* Declaration of Robert F. Serio ("Serio Decl.") Ex. A at 3; Ex. B at 1; Ex. C at 2, 33-34) and thus are protected under the "bespeaks caution" doctrine and the safe harbor for forward-looking statements in the Private Securities Litigation Reform Act ("PSLRA"). *See* 15 U.S.C. 78u-5(c). Plaintiff offers no particularized allegations that any of Veeco's forward-looking statements concerning expected "synergies" and "accretiveness" were actually false, or that anyone in Veeco management believed they were false when they were made.

Second, Plaintiff alleges that Veeco failed to disclose unwise strategic decisions to use in-house manufactured components and to build generic platforms for later customization for specific customers. *See* Compl. ¶¶ 34-35, 39, 81, 83, 91, 94, 98-99, 101, 104, 108, 110, 134, 136. This theory fails: Veeco had no obligation to disclose those internal business decisions. Even if those decisions were unwise, as Plaintiff alleges, corporate mismanagement is not actionable as securities fraud.

Third, Plaintiff alleges that Veeco failed to disclose four accounting errors relating to TurboDisc. For each such error, Plaintiff fails to plead particularized facts needed to support the required strong inference of scienter – *i.e.*, an intent to manipulate, deceive or defraud. Plaintiff also fails to allege loss causation with respect to certain of the purported accounting errors as required by the Supreme Court's decision in *Dura Pharm., Inc. v. Broudo*, 125 S. Ct. 1627 (2005), and fails to allege that other accounting errors were material.

For all of these reasons, Plaintiff's Amended Complaint should be dismissed with prejudice.

STATEMENT OF FACTS

## I.    THE PARTIES

### A.    Lead Plaintiff

Steelworkers Pension Trust ("Steelworkers") is the lead plaintiff in this action.  Steelworkers purchased 40,000 shares of Veeco stock, or approximately 0.1% of Veeco's outstanding shares.  As this Court noted in its October 12, 2005 Order, none of Veeco's largest institutional shareholders have stepped forward to participate in this action.

### B.    Defendants

Veeco is a leading provider of metrology and process equipment solutions used in the data storage, semiconductor, and compound semiconductor/wireless industries.  Serio Decl. Ex. D at 4.  The Individual Defendants are Veeco officers.

## II.    VEECO'S ACQUISITION OF TURBODISC

On November 3, 2003, Veeco announced that it was acquiring Emcore Corporation's TurboDisc business unit.  *Id.* Ex. A.  Veeco believed that TurboDisc's metal organic chemical vapor deposition ("MOCVD") technology would complement its existing molecular beam epitaxy ("MBE") technology, and could offer its customers "one stop shopping" for epitaxial deposition solutions in diverse applications, such as high-brightness LEDs and high-speed communications devices.  *Id.*

The announcement warned that "*risks associated with integrating acquired businesses and the acceptance of new products by individual customers and by the marketplace*" could impact Veeco's future financial performance.  *Id.* Ex. A at 3 (emphasis added).  Veeco's 10-Ks for 2003 and 2004 also warned that "[a]cquisitions involve numerous risks, many of which are unpredictable and beyond our control, including . . . lack of synergy or inability to realize expected synergies. . . .  Our inability to effectively manage these risks could materially and adversely affect our business, financial condition and operating results."  *Id.* Ex. C at 33-34; Ex. D at 38-39.

### III.    VEECO'S DISCOVERY OF POTENTIAL ACCOUNTING
####         ERRORS AT THE TURBODISC DIVISION

TurboDisc's MOCVD operations in Somerset, New Jersey, were combined with Veeco's MBE

operations in St. Paul, Minnesota. *Id.*, Ex. C at 4; Compl. ¶¶ 29-30. While moving TurboDisc from the

J.D. Edwards accounting software system TurboDisc had previously used to an SAP accounting

system, Veeco's internal audit staff and personnel at Veeco's headquarters (including Defendants Braun,

Rein and Kiernan) learned of potential errors in TurboDisc's financial accounts. *Id.* Ex. D at 5.

Veeco's management acted promptly to investigate the potential errors. On February 11, 2005,

Veeco announced that it was postponing the release of its financial results and that outside counsel and

forensic accounting experts were conducting an internal investigation. *Id.* Ex. E at 1-2. The

investigation, which concluded before the timely filing of Veeco's 2004 10-K on March 16, 2005,

revealed that accounting errors at TurboDisc regarding the value of inventory, accounts payable, and

certain liabilities, as well as certain revenue transactions, "were made by a single individual at

TurboDisc whose employment had been terminated prior to the commencement of the investigation."

*Id.* Ex. D at 5.

### IV.    VEECO'S RESTATEMENT OF ITS FINANCIAL RESULTS
####         FOR THE FIRST THREE QUARTERS OF 2004

Due to the investigation into the potential accounting errors, Veeco restated its financial results

for the three quarterly periods and nine months ended September 30, 2004. The restatement resulted in

a $10.2 million adjustment to pre-tax earnings, comprised of $8.1 million in adjustments relating to

inventory, accruals, and accounts payable, and $2.1 million in adjustments relating to revenue

recognition issues. *Id.*

The restatement did not result in the permanent reduction of any previously recognized revenue.

Instead, there was a shift of revenue items from a particular quarter to the following quarter, the net

effect of which was a decrease of $3.624 million in revenue in the first quarter of 2004, a decrease of

$3.638 million in revenue in the second quarter, and an increase of $5.0 million in revenue for the third quarter. *Id.* at 44-45 n.1-3, F-40.

In the month following the restatement, Veeco's stock price dropped from $18.86 per share on February 10, 2005 (the day before Veeco announced the restatement), to $13.97 per share on March 15, 2005. *Id.* Ex. F. By August 2, 2005, however, Veeco's stock price had rebounded to a price of $21.41 per share, more than 13% higher than the price of Veeco's stock on the day of the restatement. *Id.* Veeco's stock closed at $18.31 per share on December 1, 2005. *Id.*

## V.    PLAINTIFF'S CONSOLIDATED AMENDED COMPLAINT

Within just days of the February 11, 2005 announcement, the first of several securities class action suits was filed. These actions were subsequently consolidated on August 22, 2005. The Amended Complaint (filed on November 7, 2005) asserts claims under Section 10(b) and Section 20(a) of the Securities Exchange Act of 1934. The Amended Complaint does not allege that the SEC has taken any enforcement action against the Defendants (and none has occurred).

## ARGUMENT

When a plaintiff fails to plead adequately each required element of a purported claim, dismissal is required. Only well-pled allegations need be accepted and "conclusory allegations or legal conclusions masquerading as factual allegations will not suffice to prevent a motion to dismiss." *Faulkner v. Verizon Commun., Inc.*, 189 F. Supp. 2d 161, 168 (S.D.N.Y. 2002) (dismissing securities action).

## I.    PLAINTIFF'S SECTION 10(B) CLAIM SHOULD
BE DISMISSED FOR FAILURE TO STATE A CLAIM
AND FAILURE TO PLEAD FRAUD WITH PARTICULARITY

To state a claim under Section 10(b), a plaintiff must allege specific facts demonstrating (1) a misrepresentation or omission; (2) of a material fact; (3) made with scienter; (4) on which plaintiff

justifiably relied; (5) that proximately caused plaintiff's loss. *See Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001). A defendant may be liable for an alleged omission only if the plaintiff pleads and demonstrates that the defendant had a duty to disclose the omitted information. *See Chiarella v. United States*, 445 U.S. 222, 235 (1980). "The failure to establish any element is fatal to a section 10(b)/Rule 10b-5 claim." *Leemon v. Burns*, 175 F. Supp. 2d 551, 557 (S.D.N.Y. 2001) (dismissing securities fraud action).

In addition, the PSLRA requires plaintiffs to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). The PSLRA also provides that plaintiffs must, "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(2). "Group pleading" of scienter is not permissible. *See In re Citigroup Inc., Secs. Litig.*, 330 F. Supp. 2d 367, 381 (S.D.N.Y. 2004) ("[T]o satisfy the pleading requirements of Rule 9(b) and the PSLRA, a plaintiff must allege that an officer or director *personally* knew of, or participated in, the fraud."). Moreover, "the PSLRA requires plaintiffs to link *each* act or omission of the defendant to the Plaintiff's alleged losses." *Castillo v. Dean Witter Discover & Co.*, No. 97 Civ. 1272 (RPP), 1998 WL 342050, at *5 (S.D.N.Y. June 25, 1998) (citing 15 U.S.C. § 78u-4(b)(4)).[2]

---

[2] It is also well-established that "[a] complaint asserting securities fraud must also satisfy the heightened pleading requirement of Federal Rule of Civil Procedure 9(b), which requires fraud to be alleged with particularity." *Kalnit*, 264 F.3d at 138. Thus, Plaintiff must "(1) specify the statements that Plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Endovasc Ltd. v. J.P. Turner & Co.*, No. 02 Civ. 7313 (LAP), 2004 WL 634171, at *4 (S.D.N.Y. Mar. 30, 2004). "[T]o give meaning to the overall purpose of Rule 9(b), a fraud plaintiff must allege facts

[Footnote continued on next page]

As set forth below, the Amended Complaint is full of the usual hyperbolic adverbs and critically short of particularized factual allegations of scienter, materiality, and loss causation necessary to permit this case to proceed.

### A.    Optimistic Statements About TurboDisc Are Not Actionable

Plaintiff advances three basic theories of fraud, none of which satisfies the case law or PSLRA.

The first is that Defendants were excessively optimistic about TurboDisc. *See, e.g.*, Compl. ¶ 81(a) (alleging that Defendants "falsely led the investment community to believe that Veeco could vastly increase the profitability of TurboDisc, through synergies, when defendants knew or recklessly disregarded that no synergies were possible").[3]

These allegations are insufficient:  Statements of optimism such as "we believe that Emcore's MOCVD business [TurboDisc] will be accretive to Veeco" and "we see synergies" (*see* Compl. ¶¶ 78-80) cannot violate the securities laws unless they were knowingly false when made.[4]  *See San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 811 (2d Cir. 1996) (holding that "general announcements by [defendant] that it was 'optimistic' about its earnings and 'expected' . . . to perform well" were routine expressions of corporate optimism and "cannot constitute actionable statements under the securities laws").  As aptly stated:

> When one company acquires another, it is to be expected that the acquiring company will characterize the acquisition in a positive light.  Merging companies always predict that they will integrate their sales forces and management teams and that they will

_____

[Footnote continued from previous page]
giving rise to a strong inference of fraudulent intent." *In re Bristol-Myers Squibb Secs. Litig.*, 312 F. Supp. 2d 549, 556 (S.D.N.Y. 2004).

[3]  *See also* Compl. ¶¶ 32-33, 78-80, 82-83, 101, 104, 110.

[4]  There are no sufficiently particularized allegations that these statements of optimism in 2003 and 2004 (*see* Compl. ¶¶ 78-80) were knowingly false when made.

achieve 'synergies' from the combination.  Reasonable investors know better than to rely
on these statements, which are all too familiar to market observers.

*Kane v. Madge Networks N.V.*, No. C-96-20652-RMW, 2000 WL 33208116, at *3 (N.D. Cal. May 26,
2000), *aff'd*, No. 00-16344, 32 Fed. Appx. 905 (9th Cir. 2002); *see also Rombach v. Chang*, 355 F.3d
164, 172-73 (2d Cir. 2004) (holding defendants' optimistic remarks about defendants' acquisition to be
non-actionable statements of corporate optimism).  Indeed, as Judge Buchwald recently held in this
District, "investors know that the stock market is a risky business and that when a company's officer
makes predictions . . . they are not issuing guarantees." *In re Duane Reade Inc. Secs. Litig.*, No. 02 Civ.
6478 (NRB), 2003 WL 22801416, at *6 (S.D.N.Y. Nov. 25, 2003), *aff'd*, No. 03-9352, 107 Fed. Appx.
250 (2d Cir. 2004) (dismissing complaint relying in part on forward-looking statements as a matter of
law).

　　　　Far from guaranteeing increased profitability, Veeco warned investors in its November 3, 2003
press release that its forward-looking statements were "subject to a number of risks and uncertainties
that could cause actual results to differ materially from the statements made," including "risks
associated with integrating acquired businesses and the acceptance of new products by individual
customers and by the marketplace." Serio Decl. Ex. A at 3.[5]  Veeco's 10-Ks for 2003 and 2004 also
warned that "[a]cquisitions involve numerous risks, many of which are unpredictable and beyond our
control, including . . . lack of synergy or inability to realize expected synergies. . . .  Our inability to
effectively manage these risks could materially and adversely affect our business, financial condition
and operating results." *Id.* Ex. C at 33-34; Ex. D at 38-39.

　　　　The Company's forward-looking optimistic statements about TurboDisc are also not actionable,
because they were all accompanied by meaningful cautionary statements, and are thus protected under

---

[5] The November 3, 2003 conference call referenced in Paragraph 80 of the Amended Complaint was
accompanied by similar cautionary language.  Serio Decl. Ex. B at 1.

the "bespeaks caution" doctrine and the safe harbor provisions of the PSLRA. *See* 15 U.S.C. § 78u-5(c)(1) (persons are not liable for forward-looking statements "accompanied by meaningful cautionary statements," or that are "immaterial," or that are made without "actual knowledge that the statement was false or misleading"); *Rombach*, 355 F.3d at 173 ("optimistic statements [about an acquisition are] protected by the 'bespeaks caution' doctrine and the PSLRA's safe harbor").

Though Plaintiff asserts that Veeco "failed to correct previously issued statements which falsely led the investment community to believe that Veeco could increase the profitability of TurboDisc" (Compl. ¶ 83a), a company "has no duty to update forward-looking statements merely because changing circumstances have proven them wrong." *In re Duane Reade*, 2003 WL 22801416, at *7 (dismissing complaint). Moreover, Veeco specifically disclaimed any such obligation in its 2003 10-K. *See* Serio Decl. Ex. C at 2 ("The Company does not undertake any obligation to update any forward-looking statements to reflect future events or circumstances.").

Another critical defect in Plaintiff's allegations involving Veeco's statements concerning TurboDisc (*see, e.g.*, Compl. ¶¶ 78-80, 82), is that they are statements of opinion, not fact. "Plaintiffs who charge that a statement of opinion . . . is materially misleading must allege with particularity provable facts to demonstrate that the statement of opinion is both *objectively and subjectively* false." *Podany v. Robertson Stephens, Inc.*, 318 F. Supp. 2d 146, 154 (S.D.N.Y. 2004) (emphasis added). Here, no particularized facts are alleged that show that Defendants believed the acquisition would not result in synergies or be accretive to earnings or that TurboDisc was not a "recognized industry leader." Compl. ¶¶ 78-80, 82. [6]

---

[6] Plaintiff also fails to allege any facts indicating that these allegedly misleading forward-looking statements could have been material to investors, or how they contributed to its losses during the class period. *See Dura Pharm.,* 125 S. Ct. at 1634; *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 174 (2d Cir. 2005). Dismissal is also warranted for these reasons.

**B.     Allegedly Unwise Business Decisions Relating to the New TurboDisc
        Division Do Not Give Rise to a Securities Fraud Claim**

Plaintiff's second set of allegations – that Veeco made unwise business decisions relating to

TurboDisc – cannot sustain a securities fraud claim. *See, e.g.*, Compl. ¶¶ 34-39 (criticizing Veeco's

alleged decisions to substitute "key" components previously obtained from suppliers with "unproven

and untested" in-house manufactured components, to build generic MOCVD reactors that would later

be customized to fit specific customer orders and to reduce the accounting staff within TurboDisc).[7]

The securities laws were not designed to regulate corporate management's business decisions –

even if they turn out to be wrong. *See Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479 (1977)

("Congress by § 10(b) did not seek to regulate transactions which constitute no more than internal

corporate mismanagement"); *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 53 (2d Cir. 1995) (same); *In re

Citigroup*, 330 F. Supp. 2d at 375 ("Such allegations of mismanagement, even where a plaintiff claims

that it would not have invested in an entity had it known of the management issues, are insufficient to

support a securities fraud claim . . . ."). Plaintiff has transformed allegations of corporate

mismanagement into a claim that unwise business decisions were improperly not disclosed. *See, e.g.*,

Compl. ¶¶ 81b-c, 83b-d. This tactic has been repeatedly rejected by courts in the Second Circuit. *See

In re Citigroup*, 330 F. Supp. 2d at 375; *In re Am. Express Co. Shareholder Litig.*, 840 F. Supp. 260,

268 (S.D.N.Y. 1993), *aff'd*, 39 F.3d 395 (2d Cir. 1994) (dismissing claims based on failure to disclose

"gross mismanagement, lack of internal controls, waste of assets, potentially illegal conduct, and the

directors' utter failure to fulfill their stewardship responsibilities"); *In re Duke Energy Corp. Secs.*

---

[7] *See also* Compl. ¶¶ 81, 83, 91, 94, 101, 104, 108, 110, 134, 136. Notably, Plaintiff fails to allege
that Veeco's corporate accounting staff, which had primary responsibility for preparing Veeco's
consolidated financial statements, was inadequate. Instead, Plaintiff alleges only that the
accounting staff at the TurboDisc division was inadequate. Compl. ¶¶ 39, 91, 136. In addition,
there is no allegation that Veeco reduced the TurboDisc accounting staff in order to facilitate
securities fraud.

*Litig.*, 282 F. Supp. 2d 158, 160 (S.D.N.Y. 2003), *aff'd*, 113 Fed. Appx. 427 (2d Cir. 2004) (dismissing allegations of failure to disclose insufficient accounting controls); *In re Federated Dep't Stores, Inc., Secs. Litig.*, No. 00 CV 6362 (RCC), 2004 WL 444559, at *6 (S.D.N.Y. Mar. 11, 2004) (mismanagement does not imply scienter).  Nor can the claim be predicated on the suggestion that the mismanagement gave the Individual Defendants a motive to misstate the financial results:  those very individuals were the ones who, within a few months and without any alleged pressure, issued the restatements that exposed the prior defects.[8]  *See Chill v. General Elec. Co.*, 101 F.3d 263, 267 (2d. Cir. 1996) ("GE's motive in justifying its substantial investment in Kidder is not adequate to establish GE's scienter").

Putting aside the fact that the Complaint mischaracterizes Veeco's plans for TurboDisc, Veeco had no duty to disclose the internal business decisions spotlighted in the Amended Complaint.  The Second Circuit has refused to find any general duty to disclose strategic business decisions, even if those decisions might be material to investors.  *See San Leandro*, 75 F. 3d at 810 (holding that Philip Morris had no duty to disclose a marketing plan, even if "the company's marketing plans constituted material information"); *In re Union Carbide Class Action Secs. Litig.*, 648 F. Supp. 1322, 1327 (S.D.N.Y. 1986) (to require disclosure of industrial processes that were later controversial "would overwhelm an investor with scientific and administrative facts "not conducive to informed decisionmaking").  There was no duty to disclose decisions to make some parts internally or to build generic units to be modified for individual customers.  In addition, Veeco had no obligation (*see* Compl. ¶ 83) to adopt a pessimistic view of its performance or prospects.  *See Rand v. Starter Corp.*,

---

[8]  In fact, Veeco consistently cautioned investors about problems in the development and manufacturing of its products, stating that it operated in a "highly competitive industry characterized by rapid technological change," and that its operating results could be impacted by "difficulties in manufacturing or meeting technical specifications."  Serio Decl. Ex. C at 2, 33; Ex. D at 2, 37-38.

No. 94 Civ. 5325, 1995 WL 322024, at *4 (S.D.N.Y. May 30, 1995) (holding that corporations "are not required to characterize either possible results or their operations in a pejorative manner merely to cover all bases should things turn out worse than expected").

### C.    Plaintiff's Fraud By Hindsight Allegations Relating to the Restatement Are Patently Insufficient

Plaintiff has failed to establish a fundamental element – a "strong inference of fraudulent intent" on the part of each Defendant with respect to accounting items that were restated. *See, e.g., Kalnit*, 264 F.3d at 138. Plaintiff essentially asks the Court to infer that Defendants "must have known" – merely by virtue of the restatement and Defendants' positions at Veeco – that Veeco's prior financial statements were false and misleading in certain particulars. *See, e.g.*, Compl. ¶ 131-39. This is insufficient. Numerous restatement cases reject the view that a correction of a prior error is evidence that top-level executives were aware of the error and intended it to occur. This notion of "fraud by hindsight" has been repeatedly rejected. *See Fadem v. Ford Motor Co.*, 352 F. Supp. 2d 501, 519 (S.D.N.Y. 2005). Indeed, as courts have made clear, a restatement or admission of a GAAP violation, standing alone, is insufficient to state a securities fraud claim. *See In re Bristol-Myers Squibb*, 312 F. Supp. 2d at 565; *In re Carter-Wallace Inc. Secs. Litig.*, 150 F.3d 153, 157 (2d Cir. 1998); *Chill*, 101 F.3d at 270-71. Indeed, if a GAAP violation or restatement amounted to a per se violation of Section 10(b), "it would obviate the scienter requirement." *In re SCB Computer Tech., Inc. Secs. Litig.*, 149 F. Supp. 2d 334, 353, 357 (W.D. Tenn. 2001) ("Allowing for a strong inference of scienter from restated financial results when the practices leading to the original financial results fail to support a strong inference of scienter

would be equivalent to building a house without a foundation."); *In re Federated Dep't Stores*, 2004 WL 444559, at *8.[9]

### 1. Plaintiff Cannot Demonstrate That Defendants Had Any Motive to Defraud

Under the PSLRA and prior Second Circuit law, a plaintiff can establish scienter "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Kalnit*, 264 F.3d at 138. The Amended Complaint does not allege that the Individual Defendants had a sufficient motive. Allegations of motive must entail "a concrete and personal benefit to the individual defendants resulting from the fraud." *Id.* at 139. Plaintiff does not identify any such "concrete" benefits.

#### a. The Absence of Any Stock Sales Precludes Any Credible Inference of Motive

Plaintiff does not point to any stock sales by *any* of the named defendants during the purported class period, which negates any inference of fraud. *Kalnit*, 264 F.3d at 139-42 (finding that plaintiff failed to establish motive in the absence of an allegation of insider trading).

---

[9] Plaintiff attempts to impute intimate knowledge about all aspects of TurboDisc's divisional accounting to Veeco's officers and directors on the mistaken basis that TurboDisc was a "core" part of Veeco's business and technology. Compl. ¶ 137. Veeco has eight manufacturing sites and offices in 11 countries. Serio Decl. Ex. G. TurboDisc's sales accounted for only $62.7 million, or 16%, of Veeco's total sales in 2004. *Id.* Ex. D at 25. The mere fact that TurboDisc was a sizeable investment does not raise a strong inference of fraud on the part of the Defendants. *See Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 438 (5th Cir. 2002) (Parker, J., concurring) (knowledge of finances at division accounting for 20 percent of revenue could not be inferred since corporation had eight other divisions with operations worldwide); *In re Federated Dep't Stores.*, 2004 WL 444559, at *5 (that a newly acquired subsidiary represented 10% of defendant corporation's assets was not sufficient to raise inference of knowledge or recklessness).

        b.    <u>Plaintiff's Attempt to Invent a Motive Is Unavailing</u>

In the absence of any concrete and personal benefit, Plaintiff alleges that "Defendants were motivated to lie about TurboDisc's 'synergies' with Veeco and about its operations and financial results in order to justify the huge investment they had made in buying TurboDisc from Emcore." Compl. ¶ 140. As noted in Part I.A, the Amended Complaint lacks any particularized facts to support the inference that Defendants did not believe that the acquisition of TurboDisc would result in synergies. Moreover, the Second Circuit has refused to infer fraudulent intent based on a defendants' alleged motive to justify a corporate investment to shareholders. *See, e.g., Chill*, 101 F.3d at 268; *Kalnit*, 264 F.3d at 140.

Plaintiff also alleges that, "Defendants were . . . motivated to closely guard from the public that TurboDisc's reactors were defective and unsaleable, and that warranty expenses were skyrocketing due to the fact that Veeco-manufactured products were unreliable and defective, in order to protect the reputation of the TurboDisc MOCVD, and to avoid losing future customers." Compl. ¶ 141. These allegations are also insufficient. An alleged desire to appear profitable and successful is an insufficient basis for pleading motive. *See Kalnit*, 264 F.3d at 139 ("Motives that are generally possessed by most corporate directors and officers do not suffice."); *In re Crystal Brands Secs. Litig.*, 862 F. Supp. 745, 749 (D. Conn. 1994) (finding that allegations of a company's motive to "maintain good relations with suppliers, retailers and lenders" are flawed because "they pertain to any company that manufactures and distributes goods"). As held in *Kalnit*, a "motive . . . which could be imputed to any publicly-owned, for-profit endeavor, is not sufficiently concrete." 264 F.3d at 140. Moreover, the imputed motive makes no sense: why, in the absence of some precipitating event such as a governmental investigation, market rumors, a top-level resignation or a whistleblower allegation, would the same management that

presided over three quarters of erroneous statements move so promptly to issue corrections if they had a motive to defraud? [10]

### 2. Plaintiff Has Failed to Identify Specific Facts Establishing Conscious Misbehavior or Recklessness

Where, as here, Plaintiff fails to allege particularized facts giving rise to a strong inference that defendants had a motive to defraud, its fraud allegations are subject to even stricter scrutiny. Indeed, "where motive is not apparent . . . the strength of the [plaintiff's] circumstantial allegations [of conscious misbehavior or recklessness] must be *correspondingly greater*." *Kalnit*, 264 F.3d at 142 (emphasis added). Plaintiff does not come close to meeting this heightened burden.

Lacking any facts on the issue of motive except the inadequate suggestion that Defendants acted to avoid making themselves and their decisions look bad (which was squarely rejected by the Second Circuit in *Kalnit* and *Chill*), Plaintiff retreats to allegations that the Individual Defendants held high-level positions at Veeco and thus "were privy to confidential proprietary information concerning Veeco . . . [and] knew or recklessly ignored facts concerning the falsity and misleading nature of the information which they caused to be disseminated to the investing public." Compl. ¶ 131. This is equally insufficient. Courts in the Second Circuit repeatedly have rejected claims of scienter premised only upon defendants' roles or status in a company. *See, e.g., In re Citigroup*, 330 F. Supp. 2d at 381-82 (rejecting plaintiff's allegations that scienter can be inferred on the part of the defendants by virtue of their high-ranking positions with the company); *In re Keyspan Corp. Secs. Litig.*, 383 F. Supp. 2d 358, 387 (E.D.N.Y. 2003) (same).

_____

[10] *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994) ("It is hard to see what benefits accrue from a short respite from an inevitable day of reckoning. There is no claim here that false statements were made in an effort to sell off shares held by management.").

a.    Overstatement of Inventory

Plaintiff asserts that the inventory value of reactors at the TurboDisc division "should have been timely written down" at some unspecified time "during the Class Period." Compl. ¶ 75.[11]

It is well-established that "allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." *Fadem v. Ford Motor Co.*, 352 F. Supp. 2d at 516.  As courts repeatedly have recognized, the decision about when to take a write-down is a matter of business judgment.  *See In re Corning Secs. Litig.,* No. 01-CV-6580-CJS, 2004 WL 1056063, at *31 (W.D.N.Y. Apr. 9, 2004), *aff'd*, No. 04-2845-CV, 2005 WL 714352 (2d Cir. Mar. 30, 2005) (rejecting claims that defendants exercised "poor judgment" in the timing of their write-down of goodwill and inventory); *Lemmer v. Nu-Kote Holding, Inc.*, No. Civ. A. 398CV0161L, 2001 WL 1112577, at *9 (N.D. Tex. Sept. 6, 2001), *aff'd*, No. 02-11080, 2003 WL 21919902 (5th Cir. 2003) (dismissing complaint and noting that inventory write-downs "implicate judgment in the application of standards rather than . . . clean-cut rules").  The accounting principle cited in Paragraph 76 of the Complaint (ARB No. 43) confirms that in assessing the value of inventory, "judgment must always be exercised and no loss should be recognized unless the evidence clearly indicates that a loss has been sustained."[12]  Serio Decl. Ex. H at Chap. 4, ¶ 9.

Plaintiff does not identify any particularized facts demonstrating that, prior to the write-down in February 2005, Defendants believed (or recklessly ignored) that there would be a loss on the reactors that had just been built and that concededly were "cheaper to produce."  Compl. ¶ 75; *see In re Corning,* 2004 WL 1056063, at *25 (dismissing complaint that failed to allege that defendants "had a

---

[11]    *See also* Compl. ¶¶ 37, 76-77, 85, 89, 91, 96-98, 104, 108, 110, 134.

[12]    *See generally In re Bristol-Myers Squibb*, 312 F. Supp. 2d at 568-69 (finding conclusory allegations insufficient to establish scienter with respect to restatement of financials resulting from defendants' investigation of accounting practices in areas that involved judgments).

basis for believing that Corning was amassing hundreds of millions of dollars of inventory that would have to be written-off"). Although Plaintiff alleges that the $5.562 million write-down was required to reflect the "worthlessness" of Veeco's "nonsaleable" generic machines (*see id.* ¶ 75-76), Plaintiff conspicuously fails to allege – for it cannot – that these allegedly "worthless" machines were ever junked or sold below cost or that Defendants believed they were worthless during the class period. *See Remec Inc. Secs. Litig.*, 388 F. Supp. 2d 1170, 1176-77 (S.D. Cal. 2005) (dismissing complaint alleging overstatement of inventory that failed to allege corroborating facts such as "the extent of the weakening demand, the approximate value of the overstated inventory, which customers cancelled orders, allegations identifying why the inventory was obsolete and when the inventory became obsolete"). All Plaintiff can say is that Defendants allegedly knew about "increasing inventory levels throughout 2004." Compl. ¶ 77. This is a far cry from establishing knowledge that the inventory was valueless and thus is patently insufficient.[13] *See Lexar Media Inc. Secs. Litig.*, No. C-04-2013 SC, 2005 WL 1566534, at *5 (N.D. Cal. July 5, 2005) (no strong inference of fraudulent intent "[w]here increased inventory levels would be exactly what one would expect if executives forecast strong demand").[14]

        b.    The Revenue Recognition Issue Relating to the Sanan Contract

According to Plaintiff, a Veeco employee in China obtained "fictitious sign-offs" on MOCVD sales to a single customer, the Sanan Group, that resulted in "overstatements of revenue . . . of

---

[13] Moreover, conclusory allegations, allegedly coming from a confidential witness, that the Individual Defendants "knew or recklessly ignored" various issues (*see* Compl. ¶¶ 131-36) do not amount to particularized facts showing fraudulent intent. *See Gavish v. Revlon, Inc.*, No. 00 Civ. 7291 (SHS), 2004 WL 2210269, at *14 (S.D.N.Y. Sept. 30, 2004) ("[A]ffixing the phrase 'former employees have stated' to . . . an otherwise unparticularized allegation does not transform it into an allegation that meets the particularity requirements of the PSLRA.").

[14] Of course, even an adverse sales trend does not lead to a duty to depart from the cost basis of inventory pricing. *See Fadem*, 352 F. Supp. 2d at 515-16.

approximately $3,624,000, $3,638,000 and $2,200,000" in the first three quarters of 2004.[15]  Compl. ¶ 59.  These allegations do not support an inference of scienter.[16]

The assertion that Veeco recognized revenue on the Sanan Group sales agreement during the first quarter of 2004, "almost one month before the agreement was signed and publicized late in April 2004" (*see* Compl. ¶ 59), is demonstrably false.  The Sanan Group purchase contract (which Plaintiff purports to rely on in the Amended Complaint) was not signed in April 2004 as Plaintiff alleges (*see id.*), but was signed in October 2003 – six months before Plaintiff alleges and several months before Plaintiff alleges that Veeco recognized any revenue relating to the sale.  *See* Serio Decl. Ex. I.[17]

This obvious inaccuracy in the Amended Complaint strongly suggests that the Court should not credit any of Plaintiff's allegations relating to the Sanan Group.  *See In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 405-06, 427 (S.D.N.Y. 2001) (A "court need not . . . accept as truth conflicting pleadings that make no sense, or that would render a claim incoherent, or that are contradicted either by statements in the complaint itself or by documents on which its pleadings rely.");  *Rapoport v. Asia Elecs. Holding Co.*, 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000) (if documents on which a claim is based "contradict the allegations of the amended complaint, the documents control and this Court need not accept as true the allegations in the amended complaint").

Plaintiff also fails to allege particularized facts, as the PSLRA requires (*see* 15 U.S.C. § 78u-4(b)(2)), sufficient to support the allegation in the Amended Complaint that the Individual Defendants

---

[15]  Veeco's restatement related solely to the timing of revenue recognition and had no impact on Veeco's year-end revenue for 2004.  In fact, Veeco's restated revenues for the third quarter of 2004 were higher than initially reported.  Serio Decl. Ex. D at 44-45, n.1-3, F-40.

[16]  *See* Compl. ¶¶ 36, 57-61, 85, 89, 94, 96-99, 104, 108, 110, 132.

[17]  On a motion to dismiss, the Court may consider documents that are integral to a plaintiff's claim, even if they are not explicitly incorporated by reference into the complaint.  *See In re Flag Telecom Holdings, Ltd. Secs. Litig.*, 308 F. Supp. 2d 249, 253 (S.D.N.Y. 2004).

"induced" employees in China to obtain "fictitious" signoffs from the Sanan Group. Compl. ¶ 59. This is impermissible "group pleading." Plaintiff apparently bases its Sanan Group allegations solely on the word of CW-3, who is described in the Amended Complaint as "a former Veeco employee who was a high-level accounting officer at Veeco during the Class Period." Equally important, the Amended Complaint does not allege facts supporting CW-3's assertions, such as whether he/she (1) had any responsibility for sales in China (or anywhere else); (2) participated in any meetings or telephone calls relating to sales to Sanan Group; or (3) had reason to be aware of any alleged instructions given to employees in China relating to the Sanan Group. *See In re MSC Indus. Direct Co., Inc. Secs. Litig.*, 283 F. Supp. 2d 838, 846-47 (E.D.N.Y. 2003) (dismissing complaint where plaintiffs failed to allege that confidential witnesses had first-hand knowledge of matters at issue).

That Defendants Braun and Rein allegedly received an unspecified "binder" that contained a Sanan Group sales agreement (*see* Compl. ¶ 60) does not support even a weak inference that they or any of Veeco's other senior officers were aware of any "fictitious sign-offs" or improper revenue recognition relating to the Sanan contracts. Nothing in that agreement (*see* Serio Decl. Ex. I) shows either a fictitious sign-off or improper revenue recognition. This allegation amounts to nothing. *See In re Flag Telecom*, 308 F. Supp. 2d at 260 (scienter allegations are insufficient unless the sources of information and the information itself are described in detail); *Polycast Tech. Corp. v. Uniroyal, Inc.*, No. 87 CIV. 3297 (JMW), 1988 WL 96586, at *5 (S.D.N.Y. Aug. 31, 1998) (dismissing complaint that failed to link defendant in any way to the fraudulent estimate given to plaintiff).

c.    Warranty Costs/Reserves

That Veeco allegedly failed until the 2005 restatement to record a $250,000 warranty reserve due to problems with flow flanges and heating filaments at TurboDisc also does not state a claim.[18] As

_____

[18]    *See* Compl. ¶¶ 37, 62-74, 83, 88, 89, 91, 94, 96-99, 104, 133.

discussed in Part I.B above, Veeco did not have an obligation to disclose alleged problems with the

flow flanges and heating filaments.[19]  The conclusory assertion (supported only by the word of CW-3)

that Defendants were aware of the alleged quality problems with the flow flanges and heating elements

(*see id.* ¶¶ 70-72) does not support an inference that Defendants fraudulently omitted to record a

$250,000 warranty reserve until early 2005.  *See In re Am. Express*, 840 F. Supp. at 268; *In re

Citigroup*, 330 F. Supp. 2d at 381.  More is required.

 It is insufficient for Plaintiff to allege that Defendants knew (or recklessly ignored) that Veeco

needed to increase warranty reserves after only a few quarters of operating the TurboDisc business

because of "product failures," "warranty claims" (whether valid or invalid) and in-sourcing of parts.

Compl. ¶¶ 71, 133.  The allegation that Defendant Kiernan at Rein's direction reversed a proposed

accrual for $250,000 in warranty expenses at some unspecified date is insufficient.  No factual

allegations support the conclusion that this was an example of "conscious misbehavior" or

"recklessness," as opposed to a legitimate business judgment by more senior accounting personnel.

Indeed, the allegation defies common sense as well as the relevant accounting literature.  FASB

Statement No. 5, upon which Plaintiff relies (*see* Compl. ¶ 71), makes clear that accruals for warranty

losses are subject to considerable management judgment and should be adjusted only if "it is probable

that . . . a liability [has] been incurred" and "the amount of the loss can be reasonably estimated."  Serio

Decl. Ex. J ¶¶ 8, 24.  The factors normally required to sustain allegations relating to warranty reserves –

such as allegations regarding the "known or anticipated cost of repairing or replacing" defective

---

[19] As numerous courts have observed, because the setting of contingency reserves is a matter of
business judgment, a claim that Defendants did not set reserves at an adequate level "is essentially a
claim that defendants mismanaged the company" and cannot be the basis of a Section 10(b)
liability.  *Ciresi v. Citicorp*, 782 F. Supp. 819, 821 (S.D.N.Y. 1991), *aff'd*, 956 F.2d 1161 (2d Cir.
1992) (dismissing Section 10(b) claim based on alleged failure to disclose that loan loss reserves
were inadequate); *Freedman v. Value Health, Inc.*, Nos. 3:95CV2038, 3:97CV2711, 2000 WL
630916, at *5 (D. Conn. Mar. 24, 2000) (same).

products, or allegations regarding the expected timing of any anticipated repairs or replacement of defective products – are conspicuously absent from the Amended Complaint. *See In re Galileo Corp. Shareholders Litig.*, 127 F. Supp. 2d 251, 268 (D. Mass. 2001). In sum, there are no particularized factual allegations indicating why a warranty reserve should have been booked in the first three quarters of 2004 (*see* Compl. ¶¶ 71, 133) and why it showed fraudulent intent not to have established a reserve.[20]

Plaintiff also fails to allege how Veeco's alleged failure to record this minor adjustment to a single line item on the financial statements of a division with 16% of Veeco's revenues could have been material. A $250,000 adjustment to warranty reserves would have increased Veeco's cost of sales for the third quarter of 2004 from $53,634,000 to $53,884,000, a change of less than 0.5%. Courts have not hesitated to conclude that alleged misstatements that would have had a negligible effect on costs of sales are immaterial as a matter of law. In *In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1426-27 (3rd Cir. 1997), the Third Circuit, per Judge Alito, rejected the argument that reduced supplier discounts were material:

> In evaluating the materiality of the allegedly undisclosed lower discounts, . . . the district court correctly looked to the effect of these allegedly lower discounts on total costs. The impact was negligible; total costs between 1993 and 1994 increased only 0.2% and many factors other than merchandise discounts go into total costs.

---

[20] Close analysis of the Amended Complaint underscores the fatal vagueness of this allegation. According to Plaintiff, the alleged quality problems with Veeco's MOCVD reactors resulted from Veeco's decision to use in-house manufactured flow flanges and heating filaments. Compl. ¶¶ 66, 69. Plaintiff further alleges that Veeco's CEO made this decision at some unspecified time after Veeco's acquisition of TurboDisc in November 2003. *Id.* ¶ 66. Lastly, Plaintiff acknowledges that the build time for MOCVD reactors ranged from 2-6 months. *Id.* ¶ 62. Assuming that Plaintiff's allegations are accurate, the allegedly defective MOCVD reactors would not have reached consumers until early 2004, and very likely, much later. The timing of delivery makes it highly unlikely that Defendants would have been able to make a solid estimate of Veeco's warranty losses by the third quarter of 2004.

*Id.* For the same reason – the insignificance of the amounts involved – Plaintiffs' claims should be dismissed. *See also In re Duke Energy Corp.*, 282 F. Supp. 2d at 161 (inflation of $217 million, or 0.3%, of revenues immaterial "as a matter of law").

        d.    <u>Recognition of Transitional Services Agreement Revenue</u>

Plaintiff's allegations relating to purportedly improper recognition of revenue relating to a Transitional Services Agreement between Veeco and Emcore ("TSA") suffer from the same defects as Plaintiff's other allegations – *i.e.*, they are long on rhetoric but short on specific allegations of loss causation, fraudulent intent or a coherent theory of fraud.[21]

First, contrary to the Supreme Court's decision in *Dura Pharmaceuticals*, Plaintiff fails to plead loss causation with respect to the TSA claim. Plaintiff alleges that Veeco failed to "push[] back" a $1.262 million downward adjustment relating to TSA revenue into the first three quarters of 2004, and chose instead to "bury" the adjustment in the fourth quarter (*see* Compl. ¶ 55). In other words, there is no claim that overall 2004 revenues were misstated, only that the restatement in early 2005 also should have included a $1.262 million adjustment. Plaintiff fails to explain how the members of the class suffered a loss as a result of this alleged omission. As held in *Dura Pharmaceuticals*, Plaintiff may not establish loss causation merely by alleging – as in the Amended Complaint – that the stock price was "inflated" during the class period as a result of a misrepresentation. 125 S. Ct. at 1631. Instead, Plaintiff must specify "the relevant economic loss" and describe the "causal connection . . . between [the] loss and misrepresentation." *Id.* at 1634. Here, Plaintiff appears to base its TSA-related loss on Veeco's alleged announcement of a restatement in 2005 that, according to Plaintiff, did not disclose an alleged overstatement of revenue relating to the TSA. *See* Compl. ¶ 55. This is insufficient because Plaintiff does not allege how the inadequacy in the 2005 restatement caused it to suffer a loss. *See In re*

_____

[21]  *See* Compl. ¶¶ 36, 45-46, 85, 89, 91, 94, 96-99, 104, 108, 110, 135.

*IPO Secs. Litig.*, No. MDL 1554 (SAS), 2005 WL 1162445, at *3 (S.D.N.Y. May 6, 2005) ("[I]n material omission cases, a court cannot presume dissipation of the inflationary effect; a plaintiff must explicitly allege a disclosure or some other corrective event.").

To the extent Plaintiff is alleging that Veeco's alleged failure was disclosed to the public as a result of the filing of the Amended Complaint (*see id.* ¶¶ 55-56), the claim still fails. The disclosure of the alleged TSA problem in the Amended Complaint resulted in a collective yawn among investors. On November 7, 2005 (the date that Plaintiff filed the Amended Complaint), Veeco's stock closed at $15.78 per share. One day after the filing of the Amended Complaint, Veeco's stock had risen to $15.95 per share. On December 1, 2005, the stock price closed at $18.31. Serio Decl. Ex. F. Simply put, there is nothing in the Amended Complaint that explains, with regard to the TSA revenue, what loss Plaintiff suffered or how it was inflicted.[22]

Veeco had no duty to spotlight the TSA issue in its 2004 10-K. *See* Compl. ¶ 56. Moreover, Plaintiff does not dispute that the financial figures in Veeco's 2004 10-K were accurate. *See Sakhrani v. Brightpoint, Inc.*, No. IP99-0870-C-H/G, 2001 WL 395752, at *16-17 (S.D. Ind. Mar. 29, 2001) (where company's financial figures were accurate, there was no duty to disclose that major portion of $17.7 million non-recurring charge associated with the disclosed elimination of a trading division was "the result of certain inappropriate business activities carried out by individuals and third-party trading companies").

Plaintiff's theory of fraud relating to the recognition of revenue under the TSA also makes no sense. According to Plaintiff, Veeco did not enter into the TSA for a legitimate business purpose, but rather because "it permitted Veeco an opportunity to improperly and prematurely recognize income

---

[22]  To the extent Plaintiff purports to base its claim on Veeco's alleged failure to make a separate specific disclosure in its 2004 10-K concerning the alleged $1.262 million revenue adjustment relating to the TSA, Plaintiff again fails to plead loss causation for the reasons set forth above.

from Emcore that was virtually certain to go unchallenged, with no remittances from Emcore, for at least a year." Compl. ¶ 48. The Amended Complaint also states that Veeco and Emcore were obligated to settle their accounts with each other on at least an annual basis. *Id.*[23] Why on earth would Defendants concoct a scheme to defraud – involving $1.262 million in a company with over $390 million in 2004 annual revenues – that was inherently self-disclosing after a short period? The idea that Veeco engaged in a fraud that, at best, had no hope of succeeding beyond a year is implausible on its face. *See Shields*, 25 F.3d at 1130.[24]

It is also implausible that Defendants intentionally overstated TSA revenue during the first three quarters, announced a restatement a few months later for the third quarter of 2004, and then (after the announcement of the restatement) "buried with other adjustments" the adjustment to TSA revenue in Veeco's fourth quarter financial results. Compl. ¶ 55. Plaintiff essentially is alleging that Veeco expeditiously restated its financial results to correct *every* accounting error involving TurboDisc *except* the alleged overstatement of $1.262 million in revenue associated with the TSA – a line of logic that is inconsistent with its "buried" theory. Courts do not hesitate to dismiss cases based on similarly incoherent theories of fraudulent intent. *See In re Livent*, 151 F. Supp. 2d at 405 (a "court need not feel constrained to accept as truth conflicting pleadings that make no sense"); *Coates v. Heartland Wireless Commun., Inc.*, 55 F. Supp. 2d 628, 643 (N.D. Tex. 1999) (rejecting scienter allegations that were "not

---

[23] To the extent Plaintiffs allege that the allegedly improper recognition of revenue resulted from a "material weakness in controls" within TurboDisc (*see* Compl. ¶ 49), their claims amount to nothing more than allegations of mismanagement and should be dismissed for the reasons set forth in Part I.B. There is nothing in the Amended Complaint in any event that suggests that Defendants relaxed controls within TurboDisc in order to perpetrate a fraud.

[24] This point is not negated by the allegations (*see* Compl. ¶¶ 55, 135) that Defendant Kiernan, at Rein's direction, instructed that the adjustment to TSA revenue be booked in the fourth quarter of 2004. There are no facts alleged regarding this inescapably difficult area of accounting judgment showing conscious misbehavior or recklessness.

plausible" and "defie[d] common sense"). Plaintiff offers no particularized allegations to explain what "concrete benefits" (*see Kalnit*, 264 F.3d at 139) any of the Defendants possibly could have gained from such a bizarre strategy.

## II.   PLAINTIFF'S SECTION 20(a) CLAIM SHOULD BE DISMISSED

Because Plaintiff's Section 10(b) claim fails for the reasons stated above, there is no underlying primary violation. Thus, Plaintiff's Section 20(a) claim against the Individual Defendants must be dismissed. *See In re Allied Capital Corp. Secs. Litig.*, No. 02 Civ. 3812 (GEL), 2003 WL 1964184, at *7 (S.D.N.Y. Apr. 25, 2003). The Section 20(a) claim must also be dismissed for failure to identify "culpable participation in some meaningful sense by the controlling person in the fraud." *In re Allied Capital*, 2003 WL 1964184, at *7.

## CONCLUSION

For all these reasons, defendants Veeco Instruments Inc., Edward H. Braun, John F. Rein, Jr., and John P. Kiernan respectfully request that this Court dismiss Plaintiff's Consolidated Amended Complaint and award such other and further relief as the Court deems appropriate.

Dated:    December 2, 2005

Respectfully submitted,

By: _____
John A. Herfort (JH-1460)
Robert F. Serio (RS-2479)
J. Ross Wallin (JW-3911)
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, New York 10166
Phone: (212) 351-4000
Fax: (212) 351-4035

Counsel for Defendants Veeco Instruments Inc., Edward
H. Braun, John F. Rein, Jr. and John P. Kiernan

80348039_5.DOC